# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT GREENEVILLE

BOAZ PLEASANT-BEY,          )
                              )
        Plaintiff,         )
                              )     No. 2:15-cv-00174-RLJ-CRW
v.                          )
                              )
TENNESSEE DEPARTMENT OF     )
CORRECTION, et al.,         )
                              )
        Defendants.     )

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on Plaintiff's Motion for Summary Judgment [Doc. 142], Defendants Tennessee Department of Correction; Craig Jullian; Randy Lee; Gerald McAllister; Derrick Schofield; Bennie Townsend; John Walker; and Maurice Widener's Motion for Judgment on the Pleadings and Motion for Summary Judgment [Doc. 144], Defendants' Memorandum in Support [Doc. 145], Defendants' Statement of Material Facts [Doc. 146], Defendants' Response in Opposition to Plaintiff's Motion for Summary Judgment [Doc. 147], Plaintiff's Response to Defendants' Motion [Doc. 156], Plaintiff's "Rebuttal Statement of Facts" [Doc. 157], Plaintiff's Reply to Defendant's Opposition [Doc. 158], and Plaintiff's Motion to Dismiss Defendants Randy Lee and John Walker [Doc. 155]. For the reasons herein, the Court will **DENY** Plaintiff's Motion for Summary Judgment [Doc. 142], **GRANT in part and DENY in part** Defendant's Motion for Summary Judgment [Doc. 144], and **GRANT** Plaintiff's Motion to Dismiss [Doc. 155].

# I.     FACTUAL BACKGROUND AND PLAINTIFF'S ALLEGATIONS[1]

Plaintiff, proceeding pro se, brings this section 1983 civil rights action, alleging that Defendants violated his rights under the Establishment Clause and religious rights under the First Amendment's Free Exercise Clause and under the Religious Land Use and Institutionalized Persons Act (RLUIPA). [Doc. 1]. Plaintiff is a state prisoner currently housed at the Trousdale Turner Correctional Center in Hartsville, Tennessee. [Doc. 145-3 at 4:7]. The events of which he complains, however, arose while he was housed at Northeast Correctional Facility (NECX) in Mountain City, Tennessee, from approximately 2014 through 2018. [*See* Doc. 1; Doc. 145-3 at 61:12–16; Doc. 109].

## A.  Plaintiff's Halal Diet

Plaintiff, who is Muslim, became a follower of Sunnah of Prophet Muhammed. [Doc. 1 at 1; Doc. 109 at 12; Doc. 145-3 at 49:2–6]. He describes eating as "an act of worship" and believes that he can only eat traditional Halal foods "that were eaten by Prophet Muhammad himself, his Companions, and the 1st Three Generations of Muslims[.]" [Doc 109 at 10; Doc. 142 at 9; Doc. 145 at 90:14–16]. As part of his strict Halal diet, Plaintiff can only eat: "[n]atural boiled" or organic eggs [Doc. 145 at 87:24, 89:4–6]; organic, whole milk from a goat or cow [*id.* at 87:24–25, 91; 8–11, 98:7–8]; brown rice [*id.* at 94:2]; wheat bread [*id.* at 91:14–16]; a variety of green vegetables [*id.* at 91:18–22]; fish [*id.* at 89:15]; and "natural fruits" with seeds [*id.* at 92:18–20, 93:4]. Plaintiff can also eat lamb, chicken, or beef, but only if they are Halal. [*Id.* at 94:14–16]. To be considered Halal, the meat must be slaughtered by an Imam or a "qualified Muslim" [*id.* at 96:22–25, 97:1–

---

[1] The Court drafted this section according to Plaintiff's allegations in his Complaint, Plaintiff's deposition testimony, and both parties' submissions, including Defendants' statement of undisputed facts. [Doc 146]. Plaintiff did not file his own statement of undisputed facts but filed a "Rebuttal Statement of Facts." [Doc. 157].

8; Doc. 157 at 3] in "the name of Allah,"[2] [*id.* at 96:13]. The meat must also be prepared properly, free from contamination with other non-Halal meats and gelatin, which may also contain pork product. [*Id.* at 100:1–3].

Plaintiff's religious beliefs strictly prohibit him from eating pork and non-Halal meats, which he considers "haram"—foods which he states are "totally forbidden" and unlawful. [*Id.* at 89:4–6; *see* Doc. 109 at 9]. He also avoids "innovate[ed]" food [Doc. 145-3 at 88:25], "non-traditional food," or food that is in the "gray area" [*id.* at 89:2], all of which are called "Bidd'a Ta'am."[3] Unlike haram, which are forbidden foods, Plaintiff describes Bidd'a Ta'am foods as those that are "almost haram" and foods that his religion "frown[s] upon." [*Id.* at 89:1–7, 158:18; *see* Doc. 109 at 12]. "[P]rocessed foods, such as tofu and soybean meals, powdered eggs, powdered and reduced fat milk, and white bread" and generally, non-organic foods, are Bidd'a Ta'am. [Doc. 142 at 9, 77; Doc. 145 at 163:13, 16–17].

In 2014, TDOC allowed inmates to participate in the Religious Diet Program. [Doc. 142 at 52]. Jewish inmates could register to receive Kosher meals, which were either labeled as Kosher or Kosher/Halal. [Doc. 145-3 at 102:10–16, 137:5–10]. Muslim inmates could register to receive Halal meals on TDOC's Halal menu. [Doc. 109 at 9]. To ensure that Jewish and Muslim inmates' religious and dietary requirements were met, "TDOC personnel consult[ed] with external religious leaders, including imams and rabbis." [Def's Undisputed Facts, Doc. 146, at 3].

---

[2] According to Plaintiff's religious beliefs, "[t]he name of Allah must be mentioned over the animals when they are slaughtered, [and] they must die in a state of peace." [Doc. 142 at 77]. The animals must also be "properly cut [on] the esophagus, trachea and two jugular veins allowing the blood to pour out . . . to prevent the Muslims from consuming the animals blood." [*Id.*].

[3] Plaintiff also refers to the non-traditional and processed foods as Bidd'a Ta'am foods and "makruh" throughout the record, but for consistency, the Court will refer to these foods as Bidd'a Ta'am.

3

While Plaintiff was housed at NECX, he enrolled in the Religious Diet Program "and was placed" on TDOC's Halal menu. [Doc. 109 at 9]. According to Plaintiff, Defendants TDOC, TDOC Commissioner Derrick Schofield, and NECX Warden Gerald McAllister "implemented" TDOC's 2013-2015 Halal menus. [Doc. 1 at 6; Doc. 142 at 78]. He also states that Defendants NECX Chaplain Maurice Widener[4] and NECX Kitchen Staff Bennie Townsend "mandated" TDOC's 2013-2015 Halal menus. [Doc. 142, at 79; Doc. 145-3 at 162:10–11].[5]

According to Plaintiff, TDOC's Halal menu consisted of foods that were "against his beliefs to consume," and he "los[t]a lot of weight" while trying to abstain from eating those foods. [Doc. 109 at 10]. He avers that TDOC's Halal menu consisted of Bidd'a Ta'am foods—processed foods, such as powdered eggs, two percent milk, powdered milk grits, mechanically separate meat, fish patties, and unsweetened peanut butter and jelly sandwiches. [*Id.*]. He states that lunch and dinner "repeatedly" consisted of "non-traditional [Bidd'a Ta'am]" foods, such as "inedible soybean and tofu[-] based rice meals," seedless fruits, powdered eggs, and powdered milk. [Doc. 142 at 7].

Plaintiff also asserts that TDOC's Halal menu contained haram, and he offers three reasons as to why he believes the foods served on TDOC's Halal menu were haram. First, he maintains that at least one of the meats on the Halal menu—canned chicken con carne—was haram because

---

[4] The parties refer to Defendant Widener throughout the record as "Weidner." His correct surname, however, appears to be Widener, [*see* Doc. 46 at 2], and the Court will refer to him as Defendant Widener in this opinion for consistency.

[5] For clarification, Plaintiff does not state, either in his Complaint or supporting affidavits, that Defendant Jullian was involved in implementing or mandating the TDOC Halal menu; he, therefore, does not appear to be involved in Plaintiff's free-exercise claims as they relate to TDOC's Halal menu or Plaintiff's Halal diet. [*See* Docs. 1 at 6; 142 at 79 ].

4

it did not contain a Halal symbol. [*Id.* at 6–8].[6] Second, Plaintiff maintains that he personally witnessed cross-contamination of the Halal meals in NECX's kitchen. The cross-contamination would occur when inmates "occasionally prepare[d] pork and other Haram meats [and] then prepare[d] the Plaintiff's food." [*Id.* at 5]. Despite bringing "the issue to Townsend . . . . it [would] just [go] on," [Doc. 145-3 at 151:18–25], and although a "few times accommodations were made, . . . a lot of times, . . . they didn't even care," [*id.* at 145-3 at 151:18–25, 152:1–2]. Third, he states that a large portion of the foods on TDOC's Halal menu came from a facility called Cook Chill in Nashville, Tennessee—the same facility that he states would also prepare meals, including haram meats, for the general prison population. [*Id.* at 152:12–16]. According to Plaintiff, Cook Chill contaminated the Halal foods by using "the same pots, pans and with the same utensils" used to prepare haram meats for the general prison population. [Doc. 1 at 5–12].

Plaintiff states that he "filed numerous grievance[s] concerning . . . . the meals" on TDOC's Halal menu. [Doc. 109 at 10 ¶ 4]. He "even made efforts to make requests with . . . [Defendants] Townsend and . . . [Widener] concerning the meals, but . . . was told that Imam Bahloul [TDOC's Contracted Imam] approved the meals and they were the only meals available for Muslim inmates." [*Id.*].[7] Although Plaintiff states that tuna fish was a dietary option on TDOC's menu, it was "eventually removed from the TDOC Halal Menu." [Doc. 156 at 7]. He denies that he had alternative food options to the meals served on TDOC's Halal menu. [*Id.*].

---

[6] Plaintiff identifies two other meats served on TDOC's Halal menu as haram in his motion: chicken fricassee and southwest chicken. He does not indicate why he believes these meats are haram, but the Court infers it is because it was unknown to Plaintiff whether the meat was slaughtered in accordance with his religious beliefs.

[7] Plaintiff does not state who told him that an Imam approved the meals on TDOC's Halal menu or who told him that those were the only meals available to Muslim inmates.

5

## B. Special Treatment of Kosher Meals

While housed at NECX, Plaintiff states that Defendants Schofield, McAllister, Widener, Townsend, and NECX Assistant Warden Craig Jullian gave Jewish inmates "special treatment" by affording them greater dietary protections. [Doc. 1 at 6]. Kosher meals, for example, were imported to NECX from a Halal/Kosher vendor—meals that Plaintiff says were "very nicely packaged" and free from contamination. [Doc. 109 at 9]. He states that Muslim inmates, however, were not afforded those same dietary protections because "Halal food [was not] imported by a Halal vendor" and the meals were not prepackaged. [Doc. 1 at 6; *see* Doc. 145 at 139:12-14]. Instead, a large majority of those foods on TDOC's Halal menu came from Cook Chill where he believes the foods were contaminated.

## C. The Id Ul Fitra Feast

Plaintiff also celebrates Id Ul Fitra—an annual feast and "congregation . . . of worship" that concludes Ramadan. [Doc. 145 at 120:1, 121:8–9]. Like Thanksgiving, it is tradition to have certain foods for the feast. [*Id.* at 119:7–22]. Halal lamb, for instance, is an essential and traditional food for the feast and must be slaughtered at sunset, the day before the feast, or the lamb is haram. [*Id.* at 3–11].

In 2013, 2015, and 2016, Plaintiff maintains that TDOC allowed Muslim inmates to purchase traditional Halal foods and receive traditional Halal foods from "local Masjids [Islamic Places of Worship]" for the Id Ul Fitra feast. [Doc. 142 at 77]. In 2014, however, he states that TDOC implemented its own policy[8] and created its own menu of non-traditional foods for the

---

[8] Plaintiff appears to refer to this "policy" interchangeably throughout his motion as a "memorandum" that he claims was signed by Defendant Schofield. He states, however, that the memorandum is unavailable.

6

2014 Id Ul Fitr feast, which included "breaded fish with [overcooked] macaroni noodles." [*Id.* at 3, 78]. He states that during the feast, Defendants Widener and Townsend served him the overcooked noodles and fish on the same trays that they "used to serve pork and other haram meats." [*Id.* at 77].

## II.    PROCEDURAL BACKGROUND

On June 24, 2015, Plaintiff filed suit in this Court against Johnson County; Mountain City, Tennessee; Tennessee Department of Correction (TDOC); TDOC Commissioner Derrick Schofield; NECX Kitchen Staff Bennie Townsend; NECX Warden Gerald McAllister; NECX Assistant Warden Craig Jullian; NECX Chaplain Maurice Widener; and "Kitchen Stewar[dess] Walker,"[9] stating that he exhausted all administrative grievances. [Doc. 1 at 1–2].[10] Plaintiff brought several claims against Defendants under 42 U.S.C. § 1983 for a violation of his rights under the First Amendment of the United States Constitution and claims for a violation of his rights under RLUIPA. [*Id.*]. For his section 1983 claims, he seeks $700,000 from each Defendant for their alleged First Amendment violations. [*Id.* at 10].[11] Under RLUIPA, he "demands that all policies/customs be invalidated [.]" [*Id.* ¶ 4].

On March 29, 2018, the Court entered a Memorandum Opinion and Order [Doc. 97] granting Defendant's first motion for summary judgment [Doc. 89], denying Plaintiff's first

---

[9] Plaintiff moved to voluntarily dismiss Defendants Johnson County and Mountain City. [Doc. 51]. The Court granted Plaintiff's motion, and Johnson County and Mountain City are no longer parties in this action. [Doc. 52].

[10] Plaintiff does not state in his Complaint whether he is suing TDOC's and NECX's employees in their official or individual capacities.

[11] Plaintiff's Complaint does not indicate that he is seeking injunctive relief for his section 1983 claims; it only indicates that he is seeking monetary damages for his section 1983 claims. [*See* Doc. 1 at 10].

7

motion for summary judgment [Doc. 92], and dismissing the action with prejudice. Plaintiff appealed to the Sixth Circuit Court of Appeals. The Sixth Circuit affirmed, in part, and vacated, in part, the Court's decision granting summary judgment in Defendants' favor. [Doc. 105 at 10]. It remanded the case to this Court for consideration of "Pleasant-Bey's free-exercise claim related to his "strict traditional Halal food diet," stating the following:

> At the summary judgment stage . . . the court must accept [Plaintiff's] affidavit, which stated that the halal menu mainly consisted of processed foods violating his religious dietary restrictions and that he was denied adequate nutrition and caloric intake because he could not eat those meals. He also stated in his affidavit that the halal meals were prepared by inmates and staff who touched pork. Because a genuine factual dispute exists as to whether the defendants substantially burdened Pleasant-Bey's religious exercise in following a 'strict traditional Halal food diet,' the district court erred in granting summary judgment in favor of the defendants on this free-exercise claim.

[Doc. 105 at 6]. The Sixth Circuit also remanded the case to this Court as it relates to the issue of Plaintiff's Establishment Clause claim and his free-exercise claims that Defendants denied Plaintiff the opportunity to purchase traditional Halal foods and receive traditional Halal foods from local Masjids for the 2014 Id Ul Fitra Feast. [*Id.* at 7–8]. The Court, having carefully reviewed the parties' motions, is now prepared to rule on them.

## III.    PRELIMINARY MATTERS

### A.  Defendants' Motion for Judgment on the Pleadings

Defendants have moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). Defendants maintain that Plaintiff's "allegations in his complaint and in subsequent filings fail to specifically allege, as to each individual defendant, the specific manner and mechanism whereby they allegedly violated Plaintiff's civil liberties." [Doc. 145 at 15]. They therefore claim that they are entitled to judgment on the pleadings.

8

But because Defendants have also attached affidavits to their motion, the Court will first address whether it should exercise its discretion in converting Defendants' Rule 12(c) motion to dismiss into a motion for summary judgment. *See Hester v. United Healthcare Ins. Co.*, No. 1:08-cv-105, 2009 WL 128303, at *1 (E.D. Tenn. Jan. 16, 2009) ("When one or both parties present matters outside the pleadings in conjunction with a Rule 12(c) motion, the Court may, at its discretion, either consider these matters and convert the motion to one for summary judgment or exclude the extra-pleading materials and apply the standard set forth in Rule 12(c)." (citing *Max Arnold & Sons, L.L.C., v. Hailey & Co.*, 452 F.3d 494, 502 (6th Cir. 2009))). Before a court, however, converts a 12(c) motion to dismiss into a motion for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. Proc. 12(d). *But see Max Arnold,* 452 F.3d at 504 (stating that "[t]he district court's failure to give such notice and opportunity to respond is not reversible error, however, where all parties in fact had a sufficient opportunity to present pertinent materials" (citation omitted)).

In reviewing the parties' papers, they appear to have had ample opportunity to present their pertinent materials. As mentioned above, Defendants submitted affidavits in support of their motion and directs the Court to consider "subsequent filings" in deciding their motion. [Doc. 145 at 16]. Plaintiff, in opposition to Defendants' motion, also directs the Court to consider outside materials, including his own affidavits and his deposition testimony, suggesting to the Court that Defendants' motion for judgment on the pleadings should be treated as one for summary judgment. [*See* Doc. 156 at 7–9, 13–14)]. *See Morton v. ICI Acrylics, Inc.*, 69 F. Supp. 2d 1038, 1041 (W.D. Tenn. Oct. 14, 1999) ("[W]here the plaintiff responds to the motion to dismiss by also relying on evidence outside the pleadings and by suggesting to the court that the motion be treated as one for summary judgment, no notice is necessary, and no surprise should result from the conversion."

9

(citing *Emmons v. McLaughlin*, 874 F.2d 351, 356 (6th Cir. 1989))). The Court will therefore convert Defendants' motion for judgment on the pleadings into a motion for summary judgment.

### B. Plaintiff's Motion to Dismiss

After filing his motion for summary judgment [Doc. 142], Plaintiff moved to dismiss Defendants Randy Lee and John Walker [Doc. 155]. Plaintiff states that he "deems [them] as not part of this action" and requests their dismissal from this action. [*Id.* at 1]. The Court construes Plaintiff's motion as one in which he seeks to voluntarily dismiss Defendants Lee and Walker under Federal Rule of Civil Procedure 41(a)(2). Rule 41(a)(2) states that "an action may be dismissed at the plaintiff's request . . . by court order, on terms that the court considers proper." Defendants do not oppose Plaintiff's motion. The Court therefore **GRANTS** Plaintiff's motion [Doc. 155], and Defendants Randy Lee and John Walker are hereby **DISMISSED** from this action.

## IV. MOTIONS FOR SUMMARY JUDGMENT

### A. Legal Standard

Summary judgment is proper when the moving party shows, or "point[s] out to the district court," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), that the record—the admissions, affidavits, answers to interrogatories, declarations, depositions, or other materials—is without a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a), (c). The summary judgment standard under Rule 56, moreover, mirrors the directed verdict standard under Federal Rule of Civil Procedure 50(a) because "[i]n essence . . . the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–52 (1986).

On a motion for summary judgment, the movant shoulders the initial burden of identifying the basis for summary judgment and the portions of the record that lack genuine issues of material fact. *Celotex Corp.*, 477 U.S. at 323. The movant discharges this initial burden by showing "an absence of evidence to support the nonmoving party's case," at which point the nonmoving party, to survive summary judgment, must identify facts in the record that create a genuine issue of material fact. *Id.* at 324–25. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

A court's role in deciding a motion for summary judgment is limited to whether the record contains evidence that "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law," *id.* at 251–52; it is not a judge's function "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial," *id.* at 242–43. When, as here, a party has cross-moved for summary judgment, a court "'must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party.'" *Hensley v. Gassman*, 693 F.3d 681, 686 (6th Cir. 2012) (quoting *Wiley v. U.S.*, 20 F.3d 222, 224 (6th Cir. 1994)). A court may also resolve pure questions of law on a motion for summary judgment. *See Hill v. Homeward Residential, Inc.*, 799 F.3d 544, 550 (6th Cir. 2015).

### B.  Section 1983 Claims

Section 1983 permits a claim for damages against "[e]very person who, under color of [state law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The violation of a constitutional or federal statutory right is a prerequisite to a section 1983 claim because section 1983 "does not confer

11

substantive rights" on a plaintiff; instead, it is merely a conduit through which a plaintiff may sue another to "vindicate rights conferred by the Constitution or laws of the United States." *Aldini v. Johnson*, 609 F.3d 858, 864 (6th Cir. 2010); *see Graham v. Conner*, 490 U.S. 386, 393–94 (1989) ("As we have said many times, § 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" (quotation omitted)). "The first inquiry in any § 1983" suit is therefore "to isolate the precise constitutional violation with which [the defendant] is charged." *Baker v. McCollan*, 443 U.S. 137, 140 (1979). Second, a plaintiff must make the requisite showing that "the alleged deprivation was committed by a person acting under the color of state law." *West v. Akins*, 487 U.S. 42, 48 (1988).

In a section 1983 suit, an individual may bring an official-capacity suit "against the governmental entity of which the officer is an agent" or an individual-capacity suit against a government official "for actions he takes under color of state law." *Ky. v. Graham*, 473 U.S. 159, 165 (1985). In the former, an entity's "'policy or custom' must have played a part in the violation of federal law" and "[m]ore is required in an official-capacity action . . . for a governmental entity" to be liable under section 1983. *Id.* at 166 (quotation omitted). *See Carrion v. Wilkinson*, 309 F. Supp. 2d 1007, 1013 (N.D. Ohio Mar. 10, 2004) ("[A] local government entity can be found liable under § 1983 only where the harm was caused by an unconstitutional policy statement ordinance, regulation, or decision officially adopted and promulgated by the entity's officers, or custom." (citing *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978))). Specifically, the entity must be "'the moving force'" behind the alleged constitutional deprivation. *Polk Cty. v. Dodson*, 454 U.S. 312, 326 (1981) (quotation omitted). An individual capacity suit, on the other hand, "impose[s] personal liability upon a government official for actions he takes under color of state law." *Graham*, 473 U.S. at 165.

The remaining Defendants in this suit are TDOC, TDOC Commissioner Derrick Schofield, and NECX employees, whom Plaintiff appears to have sued in both their official and individual capacities,[12] and because "the Eleventh Amendment places a jurisdictional limit on federal courts in civil rights cases against states and state employees," the Court will address this topic first before addressing the merits. *Wells v. Brown*, 891 F.2d 591, 593–94 (6th Cir. 1989) ("[T]hose entitled to immunity should be granted that immunity at the earliest possible stage of the case.").

### 1. Official Capacity Claims and Monetary Damages

Defendants argue that the Eleventh Amendment bars them from suit for monetary damages in their official capacities and that they have not waived their immunity. [Doc. 145 at 14–15]. Plaintiff, in opposition, responds that Defendants waived their "immunity defenses," because they were "not previously raised in [Defendants'] first motion for summary judgment[.]" [Doc. 156 at 1, 3].

The Eleventh Amendment of the United States Constitution states that "no suit shall be commenced or prosecuted against a state[.]" U.S. Const. amend. XI. The Supreme Court has recognized that section 1983 provides litigants "a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." *Will v. Mich. Dep't. of State Police*, 491 U.S. 58, 66 (1989). *See Graham*, 473 U.S. at 169 ("[T]he Eleventh Amendment bars a damages action against a State in federal court."). The Sixth Circuit has also applied Eleventh Amendment immunity to RLUIPA claims when a prisoner sues officials in their official capacities for monetary

---

[12] Defendants correctly point out that Plaintiff has not specified in his Complaint whether he is suing TDOC's employees in their official capacities as well as in their individual capacities. *See supra* note 10.

Case 2:15-cv-00174-RLJ-CRW   Document 163   Filed 09/28/20   Page 13 of 50   PageID #: 1499

damages. *See e.g.*, *Cardinal v. Metrish*, 564 F.3d 794, 799 (6th Cir. 2009) (affirming the district court's holding that the plaintiff's RLUIPA claim for monetary damages against the defendant was barred by the Eleventh Amendment absent waiver of immunity).

Here, TDOC, NECX, and their employees in their official capacities are not persons under section 1983; instead, they are "arms" of the State of Tennessee. *See Fields v. Tenn. Dep't of Corr.*, No. 1:18-cv-1117, 2019 WL 2305155, at *3 (W.D. Tenn. May 30, 2019) ("[O]fficial-capacity claims against NECX employees also are construed as claims against . . . the State of Tennessee."); *Bostic v. Tenn. Dep't of Corr.*, No. 3:18-cv-00562, 2018 WL 3539466, at *7 (W.D. Tenn. July 23, 2018) ("A suit against the [prison] facility is in reality a suit against TDOC itself."); *Hix v. Tenn. Dep't of Corr.*, 196 F. App'x 350, 355 (6th Cir. 2006) (holding that TDOC is not a person within the meaning of section 1983); *Will*, 491 U.S. at 71 ("[A] suit against a state official in his or her official capacity is not a suit against the official but that is a suit against the official's office."). Defendants, therefore, are correct in that they are barred from suit for monetary damages absent waiver of Eleventh Amendment immunity. *Id.* at 66 ("The Eleventh Amendment bars such suits unless the State has waived its immunity[.]" (citation omitted)).[13]

In turning to whether Defendants waived Eleventh Amendment immunity, the Court must determine whether Defendants "voluntarily invoke[d]" the federal court's jurisdiction or made a "clear declaration" submitting itself to the federal court's jurisdiction. *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999) ("Generally, we will find

---

[13] Congress may also abrogate a state's Eleventh Amendment immunity, but its intent to do so must be "an unequivocal expression." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984). Neither party argues, however, that Congress, in implementing section 1983, intended to abrogate Defendants' Eleventh Amendment immunity. *See Quern v. Jordan*, 440 U.S. 332, 350 (1979) (holding that section 1983 does not abrogate a state's Eleventh Amendment immunity).

14

waiver either if the State voluntarily invokes . . . or else . . . makes a 'clear declaration' that it intends to submit itself to . . . jurisdiction[.]" (quotation omitted)). The Sixth Circuit Court of Appeals has held that a state can waive Eleventh Amendment immunity based on its "conduct in litigation." *Boler v. Earley*, 865 F.3d 391, 409–10 (6th Cir. 2017) (stating that in "*Ku v. Tennessee* . . . the State of Tennessee had voluntarily invoked jurisdiction sufficient to waive its sovereign immunity defense" after engaging in substantial discovery, filing a motion for summary judgment, and only raising Eleventh Amendment immunity after an adverse ruling). A state, for example, cannot enjoy Eleventh Amendment immunity when it engages in extensive discovery and raises this defense for the first time in its motion for a stay pending appeal of a district court's decision on the merits. *Ku v. Tenn.*, 322 F.3d 431, 432, 435 (6th Cir. 2003) (stating that "this type of clear litigation conduct creates the same kind of inconsistency and unfairness the Supreme Court was concerned with" (internal quotation marks omitted)). Some litigation conduct, however, does not rise to the level of a waiver of Eleventh Amendment immunity. *Boler*, 865 F.3d at 411 (holding that the state defendants did not waive Eleventh Amendment immunity "where the district court never issued any final judgments before the motion to dismiss and the parties had not yet engaged in discovery").

Plaintiff's contention, however, that Defendants did not raise its immunity defenses until their second motion for summary judgment is inaccurate based on a review of the record. Defendants asserted Eleventh Amendment immunity as an affirmative defense in their Answer to the Complaint [*see* Doc. 60 at 3], Amended Answer to the Complaint [*see* Doc. 64 at 2], and in their first motion for summary judgment [*see* Doc. 91 at 8]. Although the Court entered an order on the merits [*see* Doc. 98], unlike the defendant in *Ku*, Defendants did not wait until after the Court's decision on the merits to raise the Eleventh Amendment immunity defense. The "clear

litigation conduct" that would show that Defendant's intended to waive immunity is therefore absent. *Ku*, 322 F.3d at 435. *See Boler*, 865 F.3d at 411 ("Though we find that the State Defendants have participated in some litigation conduct, their actions do not rise to the level of a waiver of their Eleventh Amendment immunity."). Nor is Defendants' conduct "the same kind" that creates inconsistency and unfairness that would rise to the level of waiver of Eleventh Amendment immunity. *Ku*, 322 F.3d at 435. Because Defendants did not waive their Eleventh Amendment immunity, Plaintiff's section 1983 and RLUIPA claims for monetary damages against Defendants in their official capacities fail.

### 2. Individual Capacity Claims

Five issues are before the Court in this section 1983 suit against Defendants in their individual capacities. The Court must determine whether: (1) Defendants Townsend and Widener contaminated Plaintiff's food, in violation of his RLUIPA rights and First Amendment rights under the Free Exercise Clause; (2) TDOC's 2013-2015 Halal menu violated Plaintiff's RLUIPA rights and First Amendment rights under the Free Exercise Clause; (3) Plaintiff's diet was insufficient to sustain good health, in violation of his First Amendment rights under the Free Exercise Clause; (4) Defendants, by "refusing to allow" and "depriving" Muslim inmates the opportunity to purchase Halal food from a Halal vendor for the 2014 Id Ul Fitr Feast, violated Plaintiff's RLUIPA rights and First Amendment rights under the Free Exercise Clause [Doc. 1 at 7]; and (5) Defendants Schofield, Jullian, McAllister, Townsend, and Widener all gave Jewish inmates special treatment over Muslims inmates, in violation of his First Amendment rights under the Establishment Clause. [*Id.* at 5].

With respect to all of Plaintiff's individual-capacity claims, Defendants argue that they were not personally involved in any of the alleged unconstitutional conduct for Plaintiff to sustain

his section 1983 claims and, in the alternative, that they are entitled to qualified immunity. [*See* Doc. 146]. Because personal involvement is a prerequisite to a section 1983 claim, the Court will address this issue before addressing the merits of Plaintiff's motion. *See Mullins v. Hainesworth*, No. 95-3186, 1995 WL 559381, at *1 (6th Cir. Sept. 20, 1995) ("Liability cannot be established absent a clear showing that the defendants were personally involved in the activity forming the basis of the alleged unconstitutional behavior." (citing *Rizzo v. Goode*, 423 U.S. 362, 372 (1976)). *See also McLauren v. Morton*, 48 F.3d 944, 947 (6th Cir. 1995) (stating that "[w]hen a claim to qualified immunity arises in the context of a motion for summary judgment," the court should "first decide whether a plaintiff has stated a section 1983 against the individual defendants").

### a. Personal Involvement

Defendants maintain that Plaintiff has made no allegations of personal involvement against them to sustain a section 1983 claim. Instead, they claim that they are named as Defendants solely because on their "position[s] . . . within the TDOC hierarchy at the time of the alleged events." [Doc. 145 at 13–14]. They state, moreover, that many of Plaintiff's claims, if not all, are based on "an impermissible theory of *respondeat superior*." [*Id.* at 5].

Defendants are correct in their assertion that section 1983 liability "must be based on more than respondeat superior, or the right to control employees." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). When a plaintiff, therefore, attributes section 1983 liability to a supervisory official, a plaintiff must demonstrate that "the supervisor 'either encouraged the specific incident of misconduct or in some other way directly participated in it.'" *Id.* (quotation omitted). That is, at the very least, "a plaintiff must show that the official . . . implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Hays v. Jefferson Cty.*, 668 F.2d 869, 874 (6th Cir. 1982).

Before addressing the merits of Defendants' motion, however, the Court will first address Plaintiff's argument that Defendants have somehow "waived" their argument based on the "the theories of respondent superior." [Doc. 156 at 1]. In making this argument, he appears to rely on *Franklin v. Jenkins*, 893 F.3d 465, 471 (6th Cir. 2016), and he states that "[t]he general appellate rule of law is: 'Issues []not raised on appeal are considered abandoned and not reviewable on appeal [or on remand after appeal].'" [Doc 156 at 2]. Plaintiff, however, misapprehends this case. In *Franklin*, the petitioner—an Ohio state prisoner on death row—filed a writ of habeas corpus petition in the federal district court. 893 F.3d at 465. The district court denied his request for relief from judgment under Federal Rule of Civil Procedure 60(b), and the petitioner appealed this decision to the Sixth Circuit. *Id.* The Sixth Circuit declined to rely "on the evidence introduced in federal court" that he failed to introduce on appeal. *Id.* at 474. As such, the Sixth Circuit considered that evidence as "abandoned" for purposes of his appeal. *Id.*

This Court, however, is not an appellate court. To the extent, moreover, that Plaintiff argues that Defendants "waived" their argument by failing to address it in their first motion for summary judgment, this argument is unpersuasive; Defendants addressed respondeat superior liability in their first motion for summary judgment [*see* Doc. 91 at 2], Answer [*see* Doc. 60 at 3], and Amended Answer [*see* Doc. 64 at 3]. The Court will now turn to the merits of Defendants' motion concerning their lack of personal involvement, and because of the multiple claims involved in this case, it will address each claim separately.[14]

### i.  Free-Exercise Claims—Halal Diet and Adequate Nutrition

---

[14] Defendants do not appear to argue that they lacked personal involvement with respect to Plaintiff's claims  relating to the contamination of the foods on TDOC's Halal menu. The Court will therefore address the merits of that claim in section IV-C of this opinion.

18

Defendants argue that Plaintiff has not pointed to any individual Defendants' wrongdoing with respect to his First Amendment claim relating to his strict Halal diet. As to Defendants Schofield and McAllister, for example, they point out that Plaintiff merely alleges that they "implement[ed] a food menu for TDOC[.]" [Doc. 145 at 17]. Defendants do not cite to any case that supports their argument that implementing a food menu is insufficient personal involvement under section 1983.

In response to Defendant's motion, Plaintiff points to the TDOC Halal menus attached to his motion for summary judgment as proof that Defendant Schofield was personally involved in Plaintiff's alleged wrongdoing. He states that Defendant Schofield "signed" the TDOC Halal menus attached to Plaintiff's motion. [*Id.* at 6]. In examining the TDOC Halal menus, however, they contain no signatures or reference as to who approved or implemented them. [*See* Doc. 142 at 16–23].

Plaintiff also directs the Court, however, to his affidavit attached to his summary judgment motion in which he attests that Defendants Schofield and McAllister "implemented" the TDOC Halal menus, and the Court must accept his affidavit as true. *See Anderson*, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). *See also Alspaugh v. McConnell*, 643 F.3d 162, 168 (6th Cir. 2011) (stating that "[w]hen 'reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited'" (quoting *Schreiber v. Moe*, 596 F.3d 323, 333 (6th Cir. 2010))).

As to Defendants Townsend and Widener, Defendants ignore evidence in the record that they were directly involved in serving the foods on TDOC's Halal menu. For instance, Plaintiff states in his affidavits that Defendant Townsend "placed . . . [TDOC's] Halal Food Meals on a

19

Styrofoam tray," [Doc. 109 at 10], and that he was "served by" Townsend and Widener at the 2014 Id Ul Fitr Feast, [Doc. 142 at 77]. Plaintiff has therefore pointed to specific facts demonstrating Defendant Widener's and Townsend's direct involvement in serving the foods at NECX to allow his First Amendment claims against them to proceed. *See Colvin v. Caruso*, 605 F.3d 282, 291–93 (6th Cir. 2010) (stating that because the remaining defendants were "specifically identified by [plaintiff] as having been actively involved in serving [plaintiff] nonkosher food items . . . . [w]e must . . . address the merits").

### ii. Free-Exercise Claim—2014 Id Ul Fitr Feast

As to Plaintiff's First Amendment claim regarding the 2014 Id Ul Fitr Feast, Defendants argue that Plaintiff's allegations are "targeted, without any specificity towards Defendants McAllister, Jullian, Townsend, and [Widener]." [Doc. 145 at 16]. This is the extent, however, of Defendants' argument. They ignore Plaintiff's affidavit that states that Defendants Schofield, McAllister, Townsend, Jullian, and Widener "all stopped" him from purchasing Halal meats, baklavas, dates, thamaran fruit, and Islamic danishes or pastries, and 100% milk for the 2014 Id Ul Fitr Feast despite his "numerous requests."[15] [Doc. 142 at 77–78]. As stated above, the Court must accept Plaintiff's evidence as true. *See Anderson*, 477 U.S. at 255 ("The evidence of the non-movant is to be believed[.]"). Defendants have therefore failed to meet their initial burden as the proponents of summary judgment.

---

[15] The record is unclear as to who Plaintiff filed "numerous requests" with, whether these requests were grievance requests, and whether Defendants were merely involved in the denial of those grievances. Plaintiff has only attached blank grievance forms to his motion. *See Shehee*, 199 F.3d at 300 (holding that the defendants could not be held liable under § 1983 when their only roles "involved the denial of administrative grievances or the failure to act").

### iii. Establishment Clause Claim

Defendants state that Plaintiff's allegation that Defendants Schofield, McAllister, and Widener ensured that Jewish Kosher meals were imported to NECX, in violation of the Establishment Clause, is "non-specific and conclusory." [Doc. 145 at 16]. They further state that Plaintiff's claims that Defendants gave special treatment to Jewish inmates and discriminated against Muslim inmates are "wholly conclusory." [*Id.*].

In response, Plaintiff does not address each Defendants' personal involvement relating to his Establishment Clause claim. Instead, he merely quotes cases and states that "[t]he Kosher Menu and Halal Menu[s] . . . [are] facially different[.]" [Doc. 156 at 5]. The record as a whole is also bereft of Defendants' personal involvement as to this claim. For example, in Plaintiff's motion, he points to TDOC's Kosher menus and a policy attached to his motion in support of his argument that Defendants gave special treatment to Jewish inmates' Kosher meals. [Doc. 142 at 11]. The policy, however, is approved by Tony Parker, who is not a party to this action. [*Id.* at 40–46]. The TDOC's Kosher menus, moreover, reflect that they were approved by the Department's contracted Rabbi, who is also not a party to this action. [*Id.* at 24–25]. He also points to an email in support of his claim that "Defendant Schofield strategically choose [sic] to make special orders for vegetarian and meat entrees for the Jewish Kosher Menu while refusing to make the same purchase for the TDOC Islamic Halal Menu." [*Id.* at 9]. Defendants do not address this email or its contents, but it nonetheless does not make any mention of Defendant Schofield.[16]

---

[16] The email was sent from a "Mary Anne Jackson" to a "Chaplain Simic." [*See* Doc. 142 at 87–88].

Plaintiff, therefore, has not pointed to facts showing that each of the individual Defendants were personally involved in the disparate treatment alleged in his Complaint. *See Binay v. Bettendorf*, 601 F3d 640, 650 (6th Cir. 2010) ("Each defendants' liability must be assessed individually based on his *own* actions." (quotation omitted)). Plaintiff, moreover, cannot rest on his mere allegations to survive Defendants' motion for summary judgment. *See Anderson*, 477 U.S. at 249 ("[T]he plaintiff [can] not rest on his allegations . . . without 'any significant probative evidence tending to support the complaint.'" (quotation omitted)). For these reasons, Plaintiff's Establishment Clause claim fails.

### C. Plaintiff's First Amendment and RLUIPA Claims

There are four remaining claims for the Court's consideration: whether (1) Defendants Townsend and Widener contaminated Plaintiff's food, in violation of his free-exercise rights under the First Amendment and RLUIPA; (2) the haram and Bidd'a Ta'am foods served on TDOC's 2013-2015 Halal menu violated Plaintiff's free-exercise rights under the First Amendment and RLUIPA; (3) Plaintiff's diet was insufficient to sustain good health, in violation of his free-exercise rights under the First Amendment; (4) and Defendants, by "refusing to allow" and "depriving" Plaintiff the opportunity to purchase Halal food from a Halal vendor for the 2014 Id Ul Fitr Feast, violated his free-exercise rights under the First Amendment and RLUIPA. [Doc. 1 at 7].

The First Amendment's Free Exercise Clause, applicable to the states through the Fourteenth Amendment, provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]." U.S. Const. amend. 1. Although a prisoner's First Amendment right to exercise their religion may be subjected to reasonable restrictions and limitations, they still retain

this right. *See Abdur-Rahman v. Mich. Dep't of Corr.*, 65 F.3d 489, 491 (6th Cir. 1995) ("Inmates retain their First Amendment right to exercise their religion." (citation omitted)).

In assessing whether a plaintiff's free-exercise rights have been violated under the First Amendment, the Sixth Circuit has generally applied a two-step inquiry: a court must determine (1) whether plaintiff's religious beliefs are sincere and (2) whether the "challenged practice" infringes on the plaintiff's religious belief. *Kent v. Johnson*, 821 F.2d 1220, 1224–25 (6th Cir. 1987). "A practice will not be considered to infringe on a prisoner's free exercise unless it 'places a substantial burden on a central religious belief or practice[.]'" *Evans v. Washington*, 1:19-cv-953, 2019 WL 6974735, at *5 (W.D. Mich. Dec. 20, 2019) (quoting *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989)). *See Living Water Church of God v. Charter Tp.*, 258 F. App'x 729, 734 (6th Cir. 2007) *(*stating that "[i]n the Free Exercise context, the Supreme Court has made clear that the substantial burden hurdle is high and that determining its existence is fact intensive" (internal quotation marks omitted)). That is, the burden must be more than a "mere inconvenience" and is substantial when it forces an individual to choose between the tenets of his religion and foregoing governmental benefits or places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id.* at 734, 739, 741.

RLUIPA also applies a "[]substantial burden[] inquiry." *Holts v. Hobbs*, 574 U.S. 352, 356–57, 361 (2015). But the Sixth Circuit has held that RLUIPA affords greater religious protections to prisoners than the First Amendment, stating that RLUIPA's substantial burden inquiry "asks whether the government has substantially burdened religious exercise . . . not whether the RLUIPA claimant is able to engage in other forms of religious exercise." *Id.* at 361–62. *See Fox v. Washington*, 949 F.3d 270, 277 (6th Cir. 2020) ("Courts have recognized that, in

23

the prison context, RLUIPA provides greater protection than the First Amendment['s Free Exercise Clause].").

Under RLUIPA:

> No government shall impose a substantial burden on religious exercise of a person residing in or confined to an institution, . . . unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling government interest.

42 U.S.C. § 2000cc-1(a)(1)–(2). But the Sixth Circuit has stated that RLUIPA, involves a "'three-act play.'" *Fox*, 949 F.3d at 277 (quoting *Cavin v. Mich. Dep't of Corr.* 927 F.3d 455, 458 (6th Cir. 2019)). Under the first two steps, the prisoner shoulders the burden of demonstrating that (1) "he seeks to exercise his religion out of a sincerely held religious belief" and (2) the government substantially burdened his religious exercise. *Cavin*, 927 F.3d at 458. Once the prisoner satisfies these two steps, the burden shifts to the government to show that the burden imposed on the prisoner's religious exercise was to further a compelling government interest. *Id.*

Defendants do not dispute the sincerity of Plaintiff's religious beliefs under his First Amendment or RLUIPA claims. The Court will therefore focus its analysis on whether Plaintiff, as the movant for summary judgment, met his initial burden of showing that the record lacks a genuine issue of material fact as to whether Defendants substantially burdened his religious rights under the First Amendment and RLUIPA. *See Copeland v. Machulis*, 57 F.3d 476, 478–79 (6th Cir. 1995) ("The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case.").

### 1. Contamination

Plaintiff maintains that the "meals [on TDOC's Halal menu] substantially burdened his free-exercise rights under the First Amendment and RLUIPA because the meals were

contaminated with haram meats. [Doc. 142 at 6, 9]. He appears to allege that the cross-contamination of the Halal meals occurred inside NECX as well as outside NECX at the Cook Chill facility. [*See* Doc. 1]. First, Plaintiff states that "Bennie Townsend . . . . failed to train other inmates" to avoid cross-contaminating the Halal meals with pork. [Doc. 142 at 8]. He also states in his affidavit that Defendant Widener, as well as Defendant Townsend, contaminated his food at the 2014 Id Ul Fitr Feast when they served his food on the same trays used to serve haram meats to the general prison population. [Doc. 142 at 77]. Second, Plaintiff states in his Complaint and his motion that the pre-cooked meals prepared at Cook Chill were contaminated with pork and other haram meats. [Doc. 1; Doc. 142 at 1].

In liberally construing Plaintiff's motion, he appears to attribute liability to Defendant Townsend based on his alleged failure to train other inmates. [Doc. 142 at 8]. *See Boswell v. Mayer*, 169 F.3d 384, 387 (6th Cir. 1999) ("Pro se plaintiffs enjoy liberal construction of their pleadings and filings."). A claim against a supervisor for failure to train or supervise an offending subordinate is actionable if that supervisor (1) "encouraged the specific incident of misconduct or in some other way directly participated in it" or (2) "implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct." *Hays*, 668 F.2d at 874. By satisfying either of these elements, a plaintiff establishes what courts have described as a necessary causal connection between the execution of a supervisor's job-related functions and the constitutional deprivation at issue. *See Doe v. Claiborne Cty.*, 103 F.3d 495, 511 (6th Cir. 1996) (stating that "a show[ing] that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct . . . . follow[s] section 1983's requirement that the person sought to be held accountable actually . . . caused the deprivation" (internal quotation marks omitted)); *see also*

section 1983 (stating that liability attaches to a person who, under color of state law, "subjects, or *causes* to be subjected, any citizen" to a constitutional deprivation (emphasis added)).

But Plaintiff has not established that causal connection that would show that Defendant Townsend had any direct responsibility in training employees or inmates in NECX's kitchen or that he otherwise implicitly authorized or knowingly acquiesced the alleged misconduct—he merely states in his motion that Defendant Townsend "fail[ed] to train inmates." [Doc. 142 at 8]. *See Lupo v. Voinovich*, 235 F. Supp. 2d 782, 793 (stating that "the Sixth Circuit requires some sort of direct involvement . . . in order to impose liability under §1983") (citing *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)). To the extent, that Plaintiff alleges that Defendants Townsend and Widener, themselves, contaminated Plaintiff's food, the record is bereft of any evidence that would support that these occurrences were "willful." *Colvin*, 605 F.3d at 282, 293–94 (citing *Gallagher v. Shelton*, 587 F.3d 1063, 1070 (10th Cir. 2009) (affirming the dismissal of an inmate's free-exercise claim absent evidence that the defendants deliberately contaminated the utensils).

Plaintiff also has not shown Defendants' personal involvement in the alleged contamination of Halal meals that occurred outside of NECX at Cook Chill; in fact, he does not say whether any Defendant directly participated in the contamination that allegedly occurred at Cook Chill. Plaintiff also has not offered any evidence in the form of an affidavit or otherwise showing that he had personal knowledge of the contamination that occurred at Cook Chill. *See Weberg v. Franks*, 229 F.3d 514, 528 n.13 ("We have had to disregard many of Plaintiff's allegations because they were not made with Plaintiff's personal knowledge[.]" (citing *Wiley v. U.S.*, 20 F.3d 222, 226 (6th Cir. 1994))).

As to Plaintiff's RLUIPA claim, this claim is moot because he has since transferred from NECX to Trousdale Turner Correctional Facility and challenged the food-service practices at

NECX by NECX employees, *i.e.*, NECX Warden Widener, NECX Kitchen Staff Townsend, and NECX inmates, as opposed to challenging TDOC's policy "as a whole." *Crump v. Patrick*, No. 1:11-cv-15, 2011 WL 672213, at *6 (W.D. Mich. Feb. 18, 2011) (holding that the prisoner's RLUIPA claim was moot when he had "been transferred from MTU to JCF . . . . [and] specifically challenged only the food-service practices at MTU, not the policy of the MDOC as a whole"); *Colvin*, 605 F.3d at 289 (holding that the prisoner's challenge to the kosher-meal program was moot because the prisoner attacked only the policy at one prison rather than the overall MDOC kosher-meal policy). For the foregoing reasons, Plaintiff's First Amendment claim as it relates to cross-contamination of the Halal foods on TDOC's Halal menu fails, and Plaintiff's RLUIPA claim is moot.

### 2. Halal Diet and Adequate Nutrition

Plaintiff maintains that TDOC's 2013-2015 "place[d] a substantial burden on Plaintiff's religious exercise[.]" [Doc. 142 at 9]. He appears to challenge the TDOC Halal menu itself and offers a few reasons why "these meals" substantially burdened his First Amendment rights to freely exercise his religion. [*Id.*]. First, he states that TDOC's Halal menu "forced" him to choose between eating "[non-traditional] Bidd'a Ta'am foods [Soybean, Tofu, processed foods, powdered eggs, powdered milk, etc]" and "Haram Meats . . . (Chili Con carne)[]." [Doc. 142 at 13, 79]. He states that because "Defendants [did] not feed[] [him] any traditional Halal Foods on the [TDOC] Halal Menu," he is entitled to summary judgment. [*Id.* at 1]. Second, he appears to allege that the foods on the TDOC Halal menu did not afford him adequate nutrition, stating: "[I] los[t] a lot of weight due to . . . being forced to abstain from the haram foods and Bidd'a Ta'am meals that were served abundantly as the main portions of the Halal Menu established by the TDOC." [*Id.* at 10].

The Court, therefore, sees three issues before it as they relate to Plaintiff's free-exercise claims regarding TDOC's Halal menu: whether (1) the Bidd'a Ta'am foods, themselves, that were served on TDOC's Halal menu substantially burdened Plaintiff's First Amendment and RLUIPA rights; (2) the haram foods, themselves, that were served on TDOC's Halal menu substantially burdened Plaintiff's First Amendment and RLUIPA rights; and (3) the TDOC's Halal menu substantially burdened his First Amendment rights by forcing him to choose between eating Bidd'a Ta'am and haram foods and sustaining an adequate diet. *See Alexander v. Carrick*, 31 F. App'x 176, 179 (6th Cir. 2002) (Under the First Amendment, "[p]rison administrators must provide an adequate diet without violating the inmate's religious dietary restrictions"). For clarity, the Court will address each issue separately.

### a. Substantial Burden – Bidd'a Ta'am Foods

Plaintiff maintains that his First Amendment and RLUIPA rights were substantially burdened by the "Bidd'a Ta'am foods that were served abundantly as the main portions of the Halal Menu established by the TDOC." [Doc. 109 at 5; 142 at 10]. In his motion and his affidavit, he identifies Bidd'a Ta'am foods served on TDOC's Halal menu as "non-traditional foods" and "innovated foods" that included soybean, tofu, mechanically separated meat, powdered milk, one percent, milk, powdered eggs. [Doc. 142 at 10, 77].

Defendants respond that Plaintiff does not have a constitutional right to be served specific foods that he desires and that correctional facilities are only required to avoid feeding prisoners food that is haram. [Doc. 145 at 25]. Defendants also aver that the Bidda' Ta'am foods are not "unlawful" or "forbidden" foods, as defined by Plaintiff, and therefore, the Bidd'a Ta'am foods did not substantially burden his First Amendment or RLUIPA rights. [*Id.* at 26]. In support of their arguments, they point to Plaintiff's deposition testimony:

28

Q. Now as I understand soybean and stuff . . . . You could say that's haram[?]

A. No, it's not haram. It's innovation and it's makruh [Bidd'a Ta'am].

[*Id.* at 26; 145-3 at 158:16–17].

In reply, Plaintiff appears to reframe his argument, stating that "[t]his complaint is not about what the Plaintiff likes or what he dislikes, but rather the issue of the Plaintiff becoming malnourished from exercising his 1st Amendment" rights. [Doc. 158 at 7].

Defendants are correct, however, in that a prisoner does not have a constitutional right to specific foods that he desires. *See Rains v. Washington*, No. 2:20-cv-32, 2020 WL 1815839, at *7 (W.D. Mich. Apr. 10, 2020) (stating that "there is no constitutional right for each prisoner to be served the specific foods he desires—such as Halal meat—in prison"); *Robinson v. Jackson*, 615 F. App'x 310, 313–14 (6th Cir. 2015) (under RLUIPA or the First Amendment, "there is no constitutional right for each prisoner to be served . . . specific foods"). It is also true that "a correctional facility need only provide Muslim inmates with food that is not haram (impermissible)." *Cloyd v. Dulin*, No. 3:12-cv-1088, 2012 WL5995234, at *4 (M.D. Tenn. Nov. 30, 2012).

The law, moreover, does not support, nor is the Court aware of a case, that stands for the principle that an inmate has a constitutional right to not be served Bidd'a Ta'am food themselves, as Plaintiff defines them, or foods that Plaintiff has otherwise not identified as haram foods. *See e.g.*, *Davis v. Heyns*, No. 17-1268, 2017 WL 8231366, at *3 (6th Cir. Oct. 16, 2017) (holding that the prisoner's First Amendment rights were not substantially burdened when he "d[id] not argue that the vegan meals available to him were haram"). To the extent, therefore, that Plaintiff claims that Defendants substantially burdened his First Amendment and RLUIPA rights by serving him Bidd'a Ta'am foods, case law simply does not support this claim and it therefore fails as a matter

of law. *See e.g., Carrick,* 31 F. App'x at 179 (stating that the "case law does not support his claim that the denial of his request for a food . . . by itself violated the First Amendment right").

### b. Substantial Burden—Haram Foods

Plaintiff argues that his RLUIPA and First Amendment rights were substantially burdened by the haram foods served on TDOC's Halal menu. [Doc. 109 at 5; 142 at 10]. Other than the foods he claims were haram as a result of contamination, Plaintiff identifies three haram items on TDOC's Halal menu: chicken con carne, chicken fricassee, and southwest chicken. [Doc. 142 at 6–8]. He states that the chicken con carne was haram because the can did not contain a Halal symbol. Plaintiff attached TDOC's Halal food menus for 2013-2015 to his motion, which reflect that chicken con carne was served on TDOC's Halal menu. [*See id.* at 16–23].

Defendants do not address the TDOC Halal menus attached to Plaintiff's motion but make several arguments in response to Plaintiff. First, they argue that Plaintiff was not substantially burdened by any haram foods served on TDOC's Halal menu, because Plaintiff testified that he could avoid haram food:

Q. So at Northeastern, you could eat – you could avoid haram food: is that fair?

A. I could avoid haram food, generally.

[Doc. 145 at 19]. Second, Defendants argue that they did not serve haram foods on TDOC's Halal menu, in the first instance. In support of their argument, they have attached the affidavit of Jane Amonett, who is currently an employee of TDOC and was TDOC's former Director of Food Services. [Doc. 145-1]. Ms. Amonett attests that "[t]he meals that were provided to the Muslim inmates were in keeping with the tenants of their religion and were pork free . . . and did not contain meat items that are *Haram* or forbidden under Muslim dietary restrictions." [*Id.* at 2]. She also states that she "consult[ed] with outside entities which contract with TDOC to

provide guidance on religious requirements related to worship and diet" including "an Imam for consultation on issues related to Muslim inmates." [*Id.*]. Ms. Amonett's affidavit, however, contradicts the TDOC Halal menus attached to Plaintiff's motion, which indicate that some of the foods contained pork or pork product.[17]

Third, Defendants state that Plaintiff could eat the non-haram Bidd'a Ta'am foods on TDOC's Halal menu, because Plaintiff does not identify those foods as haram. [*Id.* at 11]. They also point to Plaintiff's Complaint, in which Plaintiff conceded to being able to eat Kosher/Halal Menus as a meal alternative [*id.* at 20]—a concession which Plaintiff vehemently refutes in his reply, stating that this was a "handwritten . . . error; that "[t]he Defense has made every effort to distort the evidence"; and that he never had access to "prepackaged Kosher meals[] or the prepackaged dual certified Halal/Kosher vegetarian meals." [Doc. 156 at 7]. The Court is mindful, however, that handwritten pro se civil rights complaints of a prisoner are to be liberally construed by a court. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (stating that "[t]he handwritten pro se document [the complaint] is to be liberally construed."). Plaintiff does, in fact, dispute that he

---

[17] Defendants also make a fourth argument. They argue that, under the *Turner v. Safley* framework, they have a legitimate penological interest in serving non-Halal meat. 482 U.S. 78, 89 (1987) ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."). The Court is mindful of the *Turner* framework, but it is noteworthy to point out that Plaintiff does not attach an actual policy directive from TDOC for it to apply the *Turner* framework; Plaintiff has only attached the TDOC Halal menus. While he does attach policies, they are not relevant to the time period in dispute, *i.e.*, 2013-2015. This case, therefore, appears to be distinguishable from other cases where courts in this circuit have applied the *Turner* framework. In those case, the courts applied the *Turner* framework to the policy directives before it. *See e.g.*, *Davis*, 2017 WL 8231366 at *1 (applying the *Turner* framework to MDOC's policy directive requiring vegan meals); *Abdullah v. Fard*, 974 F. Supp. 1112, 1114 (N.D. Ohio July 7, 1997) (applying the *Turner* framework to ODRC policy 309.01, which governed provisions concerning inmates' religious meals), *aff'd* 173 F.3d 854 (6th Cir. 1999); *Spies v. Voinovich*, 173 F.3d 398, 401–02 (6th Cir. 1999) (applying the *Turner* framework to NCCI's "rule-of-five" prison policy).

31

had access to the dual-certified Halal/Kosher meals in his first motion for summary judgment as well as in his second motion for summary judgment. [*See* Doc. 109 at 10].

Plaintiff, in his reply, also challenges the sufficiency of Ms. Amonett's affidavit, stating that it is not based on personal knowledge nor are there "cited specifics . . . about when Ms. Amonett worked as the Director of Food services with TDOC." [Doc. 158 at 9]. Plaintiff, therefore, maintains that Defendants' affidavit is insufficient to defeat Plaintiff's motion for summary judgment. The Court, however, deems Ms. Amonett's affidavit as sufficiently probative under Federal Rule 56. Under Rule 56(c)(4), "[a]n affidavit . . . used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Ms. Amonett states that she has personal knowledge based on her past position as TDOC's Director of Food Services in which she was "directly responsible for management and oversight of all dietary and food services at TDOC facilities." [Doc. 145-1 ¶ 5]. She also states that she "ensure[d] that food items provided to inmates met[] both nutritional and religious requirements" by consulting with "outside entities which contract with TDOC . . . . includ[ing] an Imam[.]" [*Id.* ¶¶ 6–7]. As such, "the food items provided to inmates [met] both nutritional and religious requirements." [*Id.* ¶ 6].

As the Court previously stated, under RLUIPA and the First Amendment, "a correctional facility need only provide Muslim inmates with food that is not haram (impermissible)." *Cloyd*, 2012 WL5995234 at *4 (citation omitted). Under the First Amendment, whether a prisoner's rights have been substantially burdened turns on whether the prisoner had an "alternative means of exercising his religion"—*i.e.*, an alternative to the haram food served on TDOC's Halal menu. *See e.g., Abdullah*, 173 F. 3d at 854 (holding that the defendants' prison policy of not providing Halal meat did not violate the plaintiff's First Amendment rights when the prisoner had an alternative

vegetarian meal option); *Davis,* 2017 WL 8231366 at *3 (holding that the defendants did not violate a prisoner's First Amendment rights when the prisoner had a vegan meal alternative to non-Halal meals). *See also Robinson*, 615 F. App'x at 313 ("We have explicitly held that vegetarian meals are, in fact, Halal."). Whether the Plaintiff had an alternative means of exercising his religion, however, is not relevant for purposes of the Court's RLUIPA analysis. *See Cavin*, 927 F.3d at 461 (stating that an "alternative means of practicing [one's] religion . . . does not play into a RLUIPA claim but it bears some weight in the First Amendment context"). *See e.g.*, *Robinson*, 615 F. App'x at 313 (holding that plaintiff failed to state a claim under RLUIPA when he was not denied Halal meals).

Defendant's argument, therefore, that Plaintiff testified that he could avoid haram foods and that therefore he was not substantially burdened by the haram foods is unpersuasive and non-dispositive to the Court's First Amendment or RLUIPA analysis. Under RLUIPA, the Court must determine whether the defendants *served* the plaintiff  haram food—a material issue of fact that the parties dispute. Under the First Amendment, a Court must determine whether a defendant provided plaintiff with an alternative to the haram food—another material issue of fact which the parties dispute. Defendants' argument, moreover, that Plaintiff could eat other non-haram Halal foods on TDOC's Halal menu, albeit Bidd'a Ta'am foods, is also unpersuasive in light of the conflicting evidence in the record; although Ms. Amonett's affidavit indicates that Muslim inmates were not served any haram food,  [Doc. 145-1 ¶ 11], Defendants do not specifically address the haram foods that Plaintiff identifies in his motion or the TDOC Halal menus attached to Plaintiff's motion which reflect that some of the meals on TDOC's Halal menu contained pork product, [Doc. 142 at 16–23].

At the summary judgment stage, however, it is not the Court's role to make credibility determinations or to weigh the parties' evidence—tasks which belong to a jury. *Anderson*, 477 U.S. at 250. The Court, instead, is limited to "determining whether there is the need for a trial." *Id.* at 255. Here there are genuine issues of material fact as to whether Defendants substantially burdened Plaintiff's First Amendment and RLUIPA rights.

### c. Substantial Burden—Adequate Diet

The Court will now turn to Plaintiff's claim that the foods on the TDOC Halal menu did not afford him adequate nutrition under the First Amendment. He states in his affidavit that "[he] los[t] a lot of weight due to . . . being forced to abstain from the haram foods and Bidd'a Ta'am meals that were served abundantly as the main portions of the Halal Menu established by the TDOC." [Doc. 142 at 10]. He also states in his affidavit that he was "deprived of the proper caloric intake for years because [TDOC's Halal] meals . . . violate[d] [his] religious beliefs." [Doc. 109 at 10].

Defendants respond that the meals on TDOC's Halal menu were calorically sufficient, and, they maintain that Plaintiff had a "myriad [of food] options available, from alternative vegetarian menus[] to Halal menus[.]" [Doc. 145 at 27]. They, again, rely on Ms. Amonett's affidavit, which states that she consulted with "the Director of Religious Services and TDOC religious personnel . . . to ensure that food items provided to inmates me[t] . . . nutritional requirements." [Doc. 145-1 at 1]. She also states that vegetarian options were available to Muslim inmates. [*Id.*].

Under the First Amendment, "[p]rison administrators must provide an adequate diet without violating the inmate's religious dietary restrictions." *Carrick*, 31 F. App'x at 176. The Sixth Circuit has stated that this is "essentially a constitutional right not to eat the offending food

34

item."[18] *Id.* "If the prisoner's diet, as modified, is sufficient to sustain the prisoner in good health, no constitutional right has been violated." *Id.*

In *Carrick*, the Sixth Circuit determined whether the plaintiff—a prisoner who practiced the Hebrew-Israelite faith—was provided with an adequate diet. *Id.* at 177. The plaintiff believed in eating a grape-free diet. *Id.* After being placed under a close-observation cell, prison officials served the plaintiff peanut butter and jelly sandwiches, fruit, and a carton of milk. *Id.* After the plaintiff discovered that the jelly was grape jelly, he requested that the defendants provide him with a plain, peanut butter sandwich. *Id.* The defendants denied the request, and thereafter, they placed the plaintiff on a Nutri-loaf diet for seven days. *Id.* The Sixth Circuit held that there was no evidence in the record to suggest that he would have been malnourished "but for the peanut butter and jelly sandwich," when the plaintiff was also served milk, fruit, he was placed on a Nutri-loaf diet, and he was only served peanut butter and jelly sandwiches for a limited time, *i.e.*, while on close observation. *Id.* at 179. The Sixth Circuit, therefore, held there was no First Amendment violation. *Id.*

The facts in Plaintiff's case, however, are distinguishable from those in *Carrick*. For instance, the length of time in which Plaintiff claims he was deprived of an adequate diet is much longer; he attests that he was "deprived of the proper caloric intake for years because [TDOC's Halal] meals . . . violate[d] [his] religious beliefs." [Doc. 109 at 10]. As discussed in the previous section, the parties also dispute whether Plaintiff had an alternative option to eating the foods on

---

[18] The Sixth Circuit appears to have defined offending food items broadly when a prisoner, such as Plaintiff here, claims that he had to choose between the offending food item and an adequate diet. *See e.g., Carrick*, 31 F. App'x at 177, 179 (holding that the defendants did not violate the prisoner's First Amendment rights when they denied his request for a grape-free diet, absent evidence that he was malnourished). It will, therefore, consider the Bidd'a Ta'am foods as offending food for purposes of analyzing his First Amendment claim that he was deprived of an adequate diet.

35

TDOC's Halal menu. Plaintiff insists that he had no alterative meal option to the Bidd'a Ta'am and haram foods on TDOC's Halal menu. [Doc. 156 at 7]. Defendants, on the other hand, claim that Plaintiff had "a myriad" of food options. [Doc. 145 at 27]. For these reasons, there are genuine issues of material fact as to whether Defendants substantially burdened Plaintiff's First Amendment rights under the Free Exercise Clause as it relates to his diet.

### 3. Id Ul Fitr Feast

Plaintiff argues that Defendants Schofield, McAllister, Jullian, Townsend and Widener "all placed a substantial burden upon [him] . . . by not allowing him to purchase traditional Halal Foods for the [2014] Id Ul Fitr Feast or have those foods donated to him by the local Masjids." [Doc. 142 at 6]. Plaintiff appears to challenge the prison's policy, which he refers to interchangeably throughout his motion as a "[m]emorandum," signed by Defendant Schofield. [*Id.* at 1]. The memorandum, however, is unavailable. [*Id.* at 1–2].[19]

Defendants respond that they did not substantially burden Plaintiff's First Amendment or RLUIPA rights for several reasons. First, they argue that Plaintiff was allowed to participate in the feast, and therefore, there was no First Amendment or RLUIPA violation. Second, they maintain that Plaintiff was provided with a non-haram food menu for the 2014 Id Ul Fitr Feast. Third, they argue that the "exclusion of non-imported food items [from local Masjids]" occurred only in 2014—"suggesting an unintentional and *de minimi*s violation, if any." [Doc. 145 at 6, 28].

---

[19] Attached to Plaintiff's motion is TDOC policy 118.01 that governs religious feasts. [Doc 142 at 48]. It reflects that Defendant Schofield approved the policy. The Court infers, however that this is not the policy that governed the 2014 Id Ul Fitr feast, because Plaintiff submitted his own affidavit in his reply to Defendant's opposition, which states that "[t]here were no policies released or published from TDOC or Derrick Schofield those years that banned outside foods for Christians and Muslims." [Doc. 158 at 12]. It is unclear why Plaintiff attached this policy and how it is relevant to his claims.

When a plaintiff, such as Plaintiff here, challenges a prison policy under the First Amendment, a court must consider whether the policy is reasonably related to legitimate penological interest under the *Turner* framework. *Turner*, 482 U.S. at 89 ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 ("To ensure that courts afford appropriate deference to prison officials, we have determined that prison regulations alleged to infringe constitutional rights are judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights."). Under the first *Turner* factor, a court should consider whether there is a valid, rational connection "between the regulation and a legitimate and neutral government interest put forward to justify it[.]" *Turner*, 482 U.S. at 78, 89. Prison administrators are given substantial deference with respect to the first factor. *See Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("This Court accords substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining a corrections system's legitimate goals and determining the most appropriate means to accomplish them."). The remaining three factors, which "should be balanced together," are: whether alternative means of exercising the right are available to prison inmates; the impact the accommodation the asserted constitutional right will have on guards and other inmates, and the allocation of prison resources, generally; and whether there is a ready alternative that fully accommodates a prisoners' rights at a de minimus cost to valid penological interests. *Flagner v. Wilkinson*, 241 F.3d 475, 484 (6th Cir. 2001); *Turner*, 482 U.S. at 90–91. But "a trial court is not required to weigh evenly, or even consider, each of the four *Turner* factors." *Spies*, 173 F.3d at 403.

The analysis, however, is different under RLUIPA. *See Hobbs*, 574 U.S. at 361 (stating that the district court erred in applying *Turner* to a prisoner's RLUIPA challenge to a prison policy). In analyzing the prison policy under RLUIPA, the Court must determine whether Defendants, by banning traditional Halal food for the 2014 Id Ul Fitr Feast, substantially burdened his rights. *See id.* ("RLUIPA's []substantial burden[] inquiry asks whether the government has substantially burdened religious exercise, not whether the RLUIPA claims is able to engage in other forms of religious exercise."). To illustrate, in *Haight v. Thompson*, the Sixth Circuit held that prison officials violated inmates' RLUIPA rights when they denied their request for traditional foods for their "annual powwow." 63 F.3d 554, 559–60 (6th Cir. 2014). The Sixth Circuit held that it did not "make a difference that prison officials allowed the inmates to have some traditional foods (fry bread) but not others (buffalo meat and corn pemmican) at the ceremony." *Id.* at 565. In response to the defendants' argument that plaintiffs only suffered a de minimis burden to their religious beliefs, the Court disagreed:

> [W]hat is unreasonable about this request? The inmates sought permission to buy two food items—at their own expenses—for a once-a-year religious event . . . . The prison's decision to bar corn pemmican and buffalo meat 'effectively bars' the inmates from this religious practice and forces them to 'modify [their] behavior' by performing less-than-complete powwows with less-than-complete meals.

*Id.* at 565–66.

In light of *Haight*, the Defendants' argument that Plaintiff only suffered a de minimus burden under RLUIPA because they served Plaintiff non-haram foods for the feast is unpersuasive. The parties, however, dispute the policy's directives. According to Defendants' affidavit of Ms. Amonett "TDOC policy *allowed* food items to be brought into prison facilities by volunteers . . . for religious feasts" up until 2018 (emphasis added). [Doc. 145 at 21; Doc. 145-1 ¶¶ 9–10]. Ms.

38

Amonett also states that, in prior years, TDOC purchased pre-packaged meals for religious feasts. In reply, Plaintiff reiterates that Defendant Schofield signed the "TDOC Memorandum" governing the Id Ul Fitr Feast. [Doc. 158 at 13]. He also attached two additional affidavits stating that "[t]here were no policies released or published from TDOC or Derrick Sc[h]ofield those years that banned outside foods . . . for the Id Ul Fitr Feast." [*Id.* at 12].

It is not the Court's role, however, to speculate as to what TDOC's policy directives were that governed the 2014 Id Ul Fitr Feast. As it stated earlier in this opinion, the Court's role is limited to "determining whether there is the need for a trial." *Anderson*, 477 U.S. at 255. Here, there are genuine issue of material fact as to whether Defendant's banned traditional Halal foods for the 2014 Id Ul Fitr Feast, in violation of Plaintiff's RULIPA and First Amendment rights.

### D.  Qualified Immunity

The Court will now turn to Defendant's qualified immunity defense as it applies to Plaintiff's remaining First Amendment claims under the Free Exercise Clause.[20] The Sixth Circuit has stated that the analysis is a two-step inquiry. *See Maye v. Klee*, 915 F.3d 1076, 1082 (6th Cir. 2019) (stating that "[i]n analyzing whether an official is entitled to qualified immunity, we must make two determinations"). *But see Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (referring to the qualified immunity analysis as "tripartite," with the final factor being whether "the plaintiff has alleged sufficient facts . . . to indicate that what the official allegedly did was

---

[20] Defendants' motion is unclear as to whether they seek qualified immunity for Plaintiff's RLUIPA claims. To the Court's knowledge, however, qualified immunity does not apply to claims for  injunctive relief. *See Bonds v. Daley*, No. 18-5666, 2019 WL 2647494, at *4 n.2 (6th Cir. May 17, 2019) (stating that qualified immunity "'only precludes claims for monetary damages against official in their individual capacities, and not claims for injunctive or declaratory relief'"(quotation omitted)); *Flagner*, 241 F.3d at 483 ("The defense of qualified immunity protects officials from individual liability for money damages but not from . . . injunctive relief."). Because Plaintiff is only entitled to injunctive relief under RLUIPA, it follows that qualified immunity does not apply to Plaintiff's RLUIPA claims.

objectively unreasonable in light of the clearly established constitutional rights" (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1157–58 (6th Cir. 1996)). The first inquiry is whether "the plaintiff's version of the facts alleges the deprivation of a constitutional right." *Maye*, 915 F.3d at 1082. The second inquiry is whether "that right was clearly established such that a reasonable official would have known his actions were unconstitutional." *Id.* (citations omitted). "An answer of 'yes' to both questions defeats qualified immunity, while an answer of 'no' to either question results in a grant of qualified immunity." *Haley v. Elsmere Police Dep't*, 452 F. App'x 623, 626 (6th Cir. 2011). In performing its analysis under the two-party inquiry, however, a court does not have to address the prongs sequentially. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("The judges of the district courts . . . should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first[.]"). Under either prong, moreover, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (citation omitted).

The plaintiff bears the "ultimate burden" of showing that a defendant is not entitled to qualified immunity. *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000). Here, Plaintiff "must show both that . . . a constitutional right was violated and that the right was clearly established at the time of the violation." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009). Under the second prong, moreover, the plaintiff must show that the right was clearly established in a "'particularized sense' such that a reasonable officer confronted with that same situation would have known that" he was violating a constitutional right. *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199–00 (2004)).

As to Plaintiff's remaining First Amendment claims, the Court has already found there are genuine issues of material fact as to whether a constitutional violation occurred under the first

prong of the qualified immunity analysis. The Court will therefore focus on the second prong—whether the "contours" of that right, at the time of the constitutional infringement, were "sufficiently clear" so "that a reasonable official would understand that what he [wa]s doing violate[d] that right." *Anderson v. Creighton*, 483 U.S. 635, 636 (1987). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate," though the existence of precedent that is "directly on point" with the specific facts or circumstances at issue is unnecessary. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *see Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) ("[A]n action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs."). The test is simply whether the law was clear enough in relation to the specific facts that confronted an official when he acted. *See Crockett v. Cumberland Coll.*, 316 F.3d 571, 583 (6th Cir. 2003) ("Whether the right at issue was 'clearly established' will turn on the 'particularized' circumstances of the case." (quotation omitted)).

But before addressing the merits of Defendants' defense, we will first briefly address Plaintiff's arguments that they waived qualified immunity. Our analysis regarding whether Defendants waived their affirmative defense of qualified immunity is essentially unchanged from our analysis addressing whether Defendants waived their arguments regarding respondeat superior liability discussed in section IV(B)(2)(a) of this opinion. Defendants asserted qualified immunity as an affirmative defense in their Answer [Doc. 60], Amended Answer [Doc. 64], and argued qualified immunity in their first motion for summary judgment [Doc. 91]. *See cf. Henricks v. Pickaway Corr. Inst.*, 782 F.3d 744, 749, 752 (6th Cir. 2015) (affirming the district courts holding "that the defendants had waived their qualified immunity defenses" when the defendants failed to assert it in their responsive pleading). The Court will now turn to the merits of Defendants'

qualified immunity defense.

### 1. First Amendment Claim—Haram Food

Defendants state that Plaintiff does not have a clear constitutional right to a strict traditional Halal diet or to "traditional Islamic halal meat items," as Plaintiff defines it. [Doc. 145 at 24]. They cite to the relevant law in this circuit, which states that a correctional facility need only provide Muslim prisoners with food that is not haram. *Cloyd*, 2012 WL5995234 at *4 (stating that "Muslim prisoners do not have a right under the First Amendment . . . to be provided halal meat entrees" and that "a correctional facility need only provide Muslim prisoners with food that is not haram" (internal quotation marks omitted)). They also state that there is no clear constitutional right for a prisoner to be provided Halal meat entrees when a prisoner has non-haram food options to eat as an alternative, citing *Robinson*, 615 F. App'x at 314 (holding that a vegetarian meal option was a constitutionally permissible alternative to the prisoner's request for Halal meals under the First Amendment). [Doc. 145 at 25]. Plaintiff, in response, states that "[t]he law on the Plaintiff's right not to eat offending food items is clearly established," citing to *Carrick* 31 F. App'x at 176. [Doc. 156 at 6]. He maintains that reasonable officials should have known "that what they were doing was wrong," because Plaintiff objected to the offending food items on TDOC's Halal menu. [*Id*.].

But the Court must determine whether Defendants Schofield, McAllister, Widener, and Townsend acted reasonably under the circumstances that were before them. *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) ("'We have repeatedly told courts . . . not to define clearly established law at a high level of generally' . . . since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.") (quotation omitted)). More, specifically, the Court must determine whether Defendants acted "intentionally" and "unreasonably" in serving Plaintiff haram foods on TDOC's Halal menu. *Colvin*, 605 F.3d at 291.

42

To illustrate, in *Colvin*, the Sixth Circuit affirmed the district court's decision granting summary judgment in the defendants' favor on qualified immunity grounds when the record merely showed that the defendants committed "reasonabl[e] mistake[s]" in serving the plaintiff non-kosher meals on "isolate[d] incidents." *Id.* at 291, 293. In that case, the plaintiff, a prisoner, sued prison officials after they erroneously denied him kosher meals. *Id.* at 286. The plaintiff filed grievances with the officials regarding this error, and thereafter, they placed the plaintiff on the kosher-meal program. *Id.* 287. After he was placed on the program, however, the plaintiff "inadvertently received nonkosher food on various occasions." *Id.* As to the chaplain, the district court held that he was entitled to qualified immunity because plaintiff did not point to evidence that he acted unreasonably or that he knowingly denied him kosher meals, stating that "at worst, [the chaplain] committed a reasonable mistake." *Id.* at 291. The district court also held that the remaining defendants were entitled to qualified immunity on the plaintiff's First Amendment claims, because plaintiff "asserted only isolated incidents of [the defendants] serving him nonkosher food." *Id.* at 293.

Similar to *Colvin¸* Plaintiff does not point to facts showing that Defendants Schofield or McAllister acted unreasonably or intentionally in implementing TDOC's Halal menu when the foods on the menu were approved by an Imam[21]—a fact that Defendants point out is undisputed.[22]

---

[21] In Plaintiff's response to Defendants' first motion for summary judgment, Plaintiff disagreed with the foods that TDOC's Imam approved as Halal on TDOC's Halal menus [SEALED Doc. 92 at 10–11, 19]. But whether Plaintiff disagreed with the choice of foods that TDOC's Imam approved has no bearing on whether Defendants acted unreasonably or intentionally under the circumstances for purposes of the Court's qualified immunity analysis. He also states in his Complaint that Defendants "falsely alleged that [an Imam] approve[d]the meals on TDOC['s] Halal menu." [Doc. 1 at 6]. But to defeat Defendants' motion, Plaintiff cannot merely rely on his allegations in his pleadings. *See Behrens v. Pelletier*, 516 U.S. 299, 309 ("On summary judgment . . . the plaintiff can no longer rest on the pleadings[.]").

[22] Federal Rule of Civil Procedure 56 instructs a trial court of its options when a party has

43

[*See* Doc. 145-3]. Plaintiff also does not dispute this fact in his reply. [*See* Doc. 158]. Plaintiff also testified during his deposition that an Imam is the very person who is qualified to certify that foods are Halal:

> Q:   So when an item has that halal stamp on it, who has observed, and witnessed, and certified that all this has gone on according to what you just said?
>
> A:   You usually have an Imam. The person that's doing it is qualified. He knows what he is doing.

[Doc. 145-3 at 96:25, 97:1–8].

Nor does the record reflect that Widener or Townsend intentionally served Plaintiff haram on TDOC's Halal menu or that they committed anything more than "isolated inciden[ts]." *Colvin*, 605 F.3d at 293. The record, for example, only reflects that Defendant Widener served Plaintiff non-Halal food on one occasion: at the 2014 Id Ul Fitr Feast. [Doc. 142 at 77]. These foods, according to Plaintiff, were breaded fish and overcooked noodles, neither of which he identifies as haram. As to Defendant Townsend, the record reflects that he also served Plaintiff overcooked noodles and breaded fish at the Id Ul Fitr Feast and on one other occasion when he "placed . . . Halal Food Meals on a Styrofoam tray." [Doc. 109 at 3; Doc. 142 at 77]. For the foregoing reasons, even in drawing all "justifiable inferences" in Plaintiff's favor, Plaintiff failed to create a genuine issue of material fact that Defendants acted intentionally and unreasonably in serving Plaintiff haram food on TDOC's Halal menu. *Anderson*, 477 U.S. at 255.

---

failed to address the opposing party's assertion of fact: "[T]he court may . . . consider the fact undisputed [and] grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to it[.]"

## 2. First Amendment Claim—Adequate Diet

As the Court stated earlier, "[p]rison administrators must provide an adequate diet without violating the inmate's religious dietary restrictions . . . . which, is essentially a constitutional right not to eat the offending food item." *Carrick*, 31 F. App'x at 176. "If the prisoner's diet, as modified, is sufficient to sustain a prisoner in good health, no constitutional right has been violated." *Id.* (citation omitted).

In analyzing the second prong under Plaintiff's First Amendment claim, however, the Court must again determine whether, under the particular circumstances, a "reasonable prison official should have known that [Plaintiff's diet] . . . was insufficient to maintain [his] health[.]" *Welch v. Spaulding*, 627 F. App'x 479, 481–82 (6th Cir. 2015). In *Welch v. Kusey*, No. 2:12-cv-13172, 2014 WL 3543270, at *1 (E.D. Mich. July 17, 2014), the district court denied the defendants' motion for summary judgment on qualified immunity grounds. In that case, the prisoner-plaintiff claimed that Ramadan meals consisting of 1,300 calories violated his First Amendment rights. *Id.* at *3. The court concluded that (1) the meals substantially infringed on the prisoner's First Amendment rights; and (2) the prisoner had a clearly established right to an adequate diet during Ramadan such that prison officials should have known that a diet consisting of only 1,300 calories per days was inadequate to sustain a "normal diet." *Id.* at *4. The Sixth Circuit affirmed the district court's decision and noted that "whether a prison official has knowingly provided a nutritionally inadequate diet is a fact-specific inquiry that requires . . . daily caloric content, duration of the diet, and the nutritional needs of the prisoner." *Welch*, 627 F. App'x at 483.

The Court, however, finds *Welch* distinguishable from the facts in Plaintiff's case, in which the Sixth Circuit held that factual issues precluded summary judgment in the defendants'

45

favor. *Id.* at 484 ("The legal question of immunity will depend on which version of the facts the jury finds most credible"). The Sixth Circuit noted that the prisoner in *Welch* presented evidence that his diet was insufficient to sustain him in good health. *Id.* at 482. The plaintiff, for instance, submitted nutritional charts with estimates of his daily caloric intake of 1,300 per day during Ramadan, "[t]ying individual menu items to their respective caloric values." *Id.* at 484. The Ramadan menus and calorie counts were also available to the defendants, and the plaintiff told the defendants that the meals were calorically insufficient. *Id.* The Sixth Circuit rejected defendants' argument, therefore, that they had no actual knowledge of the caloric content of the Ramadan meals. *Id.*

Plaintiff, by contrast, has not pointed to specific facts showing the Defendants Schofield, McAllister, Widener, or Townsend "knowingly provided a nutritionally inadequate diet" such that reasonable officials would have known they were violating his constitutional rights. *Id.* at 482. He does not direct the Court to any specific evidence that Defendants knew that his meals on TDOC's Halal menu, as modified, were calorically deficient. Although he states that he "filed numerous grievance[s] concerning" the foods on TDOC's Halal menu, it is unclear who he filed grievances with or whether he in fact grieved the caloric content of the meals he states he could not eat on TDOC's Halal menu. [Doc. 109 at 10].[23] He also states that he "even *made efforts* to make requests with . . . [Defendants] Townsend and . . . [Widener] concerning the meals" on TDOC's Halal menu, but he does not point to any evidence showing that he in fact made those requests to Defendants Townsend and Widener (emphasis added). [*Id.*]. For these reasons, the Court finds that Plaintiff has not created a genuine issue of material fact that Defendants knowingly provided Plaintiff with an inadequate diet.

---

[23] Plaintiff has only attached blank grievance forms to his motion.

### 3. First Amendment Claim—Id Ul Fitr Feast

Plaintiff appears to argue that he had a clearly established right at the time of the alleged constitutional violation to have traditional Halal foods for the 2014 Id Ul Fitr Feast. [Doc. 156 at 4–5]. He relies on *Dowdy-El v. Caruso,* No. 06-11765, 2012 WL 6642763, at *1 (E.D. Mich. Dec. 20, 2012), the Sixth Circuit's opinion in *Haight v. Thompson*, 763 F.3d at 554, 558–59, and the Sixth Circuit's opinion in *Whitney v. Brown*, 882 F.2d 1068 (6th Cir. 1989), to show that Plaintiff had a clearly established right to be served traditional Halal foods at the 2014 Id Ul Fitr feast.

None of the cases, however, put the "constitutional question beyond debate," because they are not "directly on point" with the specific facts or circumstances at issue in Plaintiff's case. *al-Kidd*, 563 U.S. at 741 (citations omitted). But beginning with *Dowdy-El*, the precise constitutional issue there was whether the defendants violated the prisoners' First Amendment rights when they refused to allow the prisoners to *participate* in the Eid feast. 2012 WL 6642763 at *1. Plaintiff, however, does not argue, however, that he was unable to *participate* in the 2014 feast; rather, he argues that Defendants "stopped" from purchasing and receiving traditional Halal foods for the 2014 Id Ul Fitr Feast. [Doc. 142 at 77–78].

In *Whitney*, the inmates challenged a prison policy that eliminated Sabbath service and annual Passover Seders. 882 F.3d at 1071. The Sixth Circuit agreed with the district court's holding that the prison's policy of eliminating annual Passover Seders violated the inmates' First Amendment rights, because it "foreclose[d] the only means by which the Jewish inmates may exercise their asserted right to mark Passover." *Id.* at 1073. It also held that the prison policy's "prohibition of intercomplex travel of the . . . Jewish inmates" was an exaggerated response to the prison's security objectives under *Turner*, and therefore, the policy was invalid. *Id.* at 1078.

47

*Whitney*, however, is also factually dissimilar from the issues in Plaintiff's case, because again, Plaintiff does not argue that he was unable to participate in the Id Ul Fitr Feast.

Lastly, unlike *Dowdy-El* and *Whitney*, *Haight* is more factually similar to the issues at hand in Plaintiff's case but only involved prisoners' claims under RLUIPA—not the First Amendment. As discussed earlier in this Court's opinion, the inmates in *Haight* argued that prison officials denied their request for traditional foods for their "annual powwow" in violation of their RLUIPA rights. 763 F.3d at 559–60. The Sixth Circuit held that it did not "make a difference that prison officials allowed the inmates to have some traditional foods (fry bread) but not others (buffalo meat and corn pemmican) at the ceremony." *Id.* at 565. In response to the defendants' argument that plaintiffs only suffered a de minimis burden on their religious beliefs, the Court disagreed, stating, "[W]hat is unreasonable about this request? The inmates sought permission to buy two food items—at their own expenses—for a once-a-year religious event." *Id.* at 566. Despite the factual similarities to Plaintiff's case, the law was not clearly established under the First Amendment. For these reasons, Plaintiff has failed to show that he had a clearly established right to traditional Halal foods for the 2014 Id Ul Fitr feast under the First Amendment such that Defendants would have known their actions—in alleging banning traditional Halal foods for the feast—were unconstitutional. *See Key v. Grayson*, 179 F.3d 996, 1000 (6th Cir. 1999) ("The burden of convincing a court that the law was clearly established 'rests squarely with the plaintiff.'" (quotation omitted)).

## V.    CONCLUSION

Plaintiff's Motion to Dismiss [Doc. 155] is **GRANTED**. For the foregoing reasons, Defendants Randy Lee and John Walker are hereby **DISMISSED** from this action. Plaintiff's Motion for Summary Judgment [Doc. 142] is **DENIED**, and Defendant's Motion for Summary

48

Judgment [Doc. 144] is **GRANTED in part and DENIED in part** for the following reasons:

Section 1983 Official-Capacity Claims

- Plaintiff's First Amendment claims for monetary damages against Defendants TDOC, Schofield, Jullian, McAllister, Townsend, and Widener, are **DISMISSED WITH PREJUDICE**, because they are barred from suit under Eleventh Amendment Immunity.

Section 1983 Individual-Capacity Claims

- Plaintiff's free-exercise claim under the First Amendment against Defendants Townsend and Widener, as it relates to contamination of Plaintiff's Halal meals, is **DISMISSED WITH PREJUDICE**;

- Plaintiff's free-exercise claim under the First Amendment against Defendants Schofield, McAllister, Townsend, and Widener, as it relates to Bidd'a Ta'am foods on TDOC's Halal menu, is **DISMISSED WITH PREJUDICE**;

- Plaintiff's Establishment Clause claim under the First Amendment against Defendants Schofield, Jullian, McAllister, Widener, and Townsend is **DISMISSED WITH PREJUDICE** for their lack of personal involvement;

- Plaintiff's free-exercise claim under the First Amendment against Defendants Schofield, McAllister, Townsend, and Widener, as it relates to haram foods on TDOC's Halal menu, is **DISMISSED WITH PREJUDICE**, because they are entitled to qualified immunity;

- Plaintiff's free-exercise claim under the First Amendment against Defendants Schofield, McAllister, Townsend, and Widener, as it relates to Plaintiff's adequate nutrition, is **DISMISSED WITH PREJUDICE**, because they are entitled to qualified immunity; and

- Plaintiff's free-exercise claim under the First Amendment against Defendants Schofield, McAllister, Jullian, Townsend, and Widener, as it relates to the 2014 Id Ul Fitr Feast, is **DISMISSED WITH PREJUDICE** because they are entitled to qualified immunity.

**RLUIPA Claims**

- Plaintiff's RLUIPA claim for injunctive relief against Defendants Townsend and Widener, as it relates to the contamination of foods on TDOC's Halal menu, is **DISMISSED AS MOOT**;

- Plaintiff's RLUIPA claim for injunctive relief against Defendants Schofield, McAllister, Townsend, and Widener, as it relates to the Bidd'a Ta'am foods on TDOC's Halal menu, is **DISMISSED WITH PREJUDICE**; and

- Genuine issues of material fact exist as to two of Plaintiff's RLUIPA claims for injunctive relief: (1) whether haram food served on TDOC's Halal menu substantially burdened Plaintiff's RLUIPA rights; and (2) whether Defendants substantially burdened Plaintiff's RLUIPA rights by banning traditional Halal food for the 2014 Id Ul Fitr Feast. *See Haight*, 63 F.3d at 554, 559–60 (holding that prison officials violated inmates' RLUIPA rights when they denied the inmates' request for traditional foods for their "annual powwow").

The Court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. *See* Rule 24 of the Federal Rules of Appellate Procedure.


      **IT IS SO ORDERED.**

ENTER:


_____
s/ Leon Jordan
United States District Judge